# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 17-288V
(Filed: December 4, 2020)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| COOPER J. HUMPHRIES, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | |
| v. | * | Decision on Interim Attorneys' Fees and |
| | * | Costs; Reasonable Basis; Hourly Rate; |
| SECRETARY OF HEALTH | * | Unreimbursable Costs |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

*Jessica Wallace, Esq.*, Siri & Glimstad, LLP, New York, NY, for petitioner.
*Mark Hellie, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION ON INTERIM ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On March 1, 2017, Cooper Humphries ("Mr. Humphries" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 et seq.[2] ("Vaccine Act" or "the Program"). Petitioner alleges that he received human papillomavirus ("HPV") vaccinations on July 1, 2015 and August 14, 2015, and thereafter developed Postural Orthostatic Tachycardia Syndrome ("POTS"). Petition, ECF No. 1. Petitioner now requests an award of interim attorneys' fees and costs. Petitioner's Motion is hereby **GRANTED IN PART**.

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**I. Procedural History**

The petition was filed on March 1, 2017, along with medical records and petitioner's affidavit. Petition; Petitioner's Exhibits ("Pet. Ex.") 1-6, ECF No. 1.

Petitioner filed additional medical records on March 3, 2017 and a statement of completion on March 15, 2017. Pet. Ex. 7-14, ECF No. 6; Statement of Completion, ECF No. 8.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on August 24, 2017, recommending against compensation in this matter. ECF No. 11. Petitioner was ordered to file an expert report in support of his claim. Non-PDF Order, issued Aug. 25, 2017.

Petitioner filed an expert report, CV, and medical literature from Dr. Blitshteyn, a neurologist, on December 11, 2017. Pet. Ex. 15-24, ECF No. 15; Pet. Ex. 25-34, ECF No. 16; Pet. Ex. 35-43, ECF No. 17. Following a 60-minute phone conference call with petitioner and a review of petitioner's medical records, Dr. Blitshteyn opined that petitioner has POTS caused by his HPV vaccinations. Dr. Blitshteyn explained, "The identification of antibodies in the serum of patients with POTS, in conjunction with [a] clinical history of onset after a viral illness or vaccination, provides substantial evidence of the autoimmunity as a cause of POTS in many patients including [petitioner] who also tested positive for ANA." Pet. Ex. 15 at 4. Dr. Blitshteyn claimed that the HPV vaccine "has been specifically observed as a possible trigger" of POTS, neurocardiogenic syncope, and other neurological disorders. *Id.* She cited to a study of six patients who developed POTS following HPV vaccination, as well as larger studies done in Japan, Denmark, Italy, and Mexico, in which patients reported autonomic dysfunction after receiving the HPV vaccine. She also pointed to VAERS reports of POTS following HPV vaccination. Dr. Blitshteyn offered molecular mimicry as a mechanism causally connecting the HPV vaccine with POTS, stating that antibodies most likely cross-reacted with potential targets of the autonomic ganglia, neurons, cardiac proteins, or adrenergic receptors. *Id.* at 4-5.

On March 9, 2018, respondent filed expert reports and supporting medical literature from Dr. Gibbons, a neurologist, and Dr. Whitton, a virologist. Resp. Ex. A-B, ECF No. 21; Resp. Ex. C-D, ECF No. 22; Resp. Ex. C, Tabs 9-14, ECF No. 23. Dr. Gibbons disagreed with petitioner's diagnosis of POTS, noting that petitioner's "single elevated heart rate during autonomic testing was never confirmed during other clinical visits." Resp. Ex. A at 4. Dr. Gibbons pointed out that petitioner had a history of elevated heart rates prior to his onset of syncopal spells. According to Dr. Gibbons, most high school and college athletes have resting heart rates near 60 beats per minute, while petitioner had resting heart rates in the 70 to 90 beats per minute range. He opined that petitioner's history of elevated heart rates renders his single elevated heart rate during autonomic testing to be less significant and less indicative of POTS. *Id.* Dr. Gibbons further opined that there is no connection between the HPV vaccine and POTS. He noted petitioner did not test positive for any of the antibodies cited by Dr. Blitshteyn as potential molecular mimics which could cause POTS. Dr. Gibbons also cited to the European Medical Agency report and a Finnish study, neither of which showed a connection between POTS and the HPV vaccine. *Id.* at 5. In Dr. Gibbon's opinion, petitioner's initial syncopal event was more likely than not a heat-related exertional illness, and not related to his receipt of HPV vaccines. *Id.* at 6.

Dr. Whitton declined to comment on whether petitioner's diagnosis of POTS is accurate; he limited his opinion to addressing the causal link between the HPV vaccine and POTS. Resp. Ex. C at 1. Dr. Whitton disagreed with Dr. Blitshteyn's opinion of molecular mimicry as a causal mechanism. He pointed out that she only mentioned antibodies; she did not provide any evidence to suggest that they can cross-react with the HPV vaccine. For example, she did not cite any amino acid sequences shared by HPV proteins and host proteins that could be a target for a molecular mimic. *Id*. at 7. In Dr. Whitton's opinion, there is no credible evidence that the HPV vaccine can trigger or cause POTS. *Id*. at 12.

Additionally, Dr. Whitton criticized the studies referenced by Dr. Blitshteyn, submitting that they were tainted by selection bias. One study only selected subjects who had received the HPV vaccine and experienced orthostatic intolerance. Resp. Ex. C at 3; *see also* Pet. Ex. 30. He also pointed out that Dr. Blitshteyn relied on a paper authored by Dr. Shoenfeld, with whom she has previously collaborated. Resp. Ex. C at 4-5; *see also* Pet. Ex. 25. According to Dr. Whitton, the paper did not demonstrate that POTS is autoimmune. Additionally, the study was funded by Claire Dwoskin, a demonstrated anti-vaccine advocate. Dr. Shoenfeld is a board member of the Dwoskin Foundation. Dr. Blitsheyn also cited to another paper authored by Dr. Shoenfeld and funded by the Dwoskin Foundation, Pet. Ex. 41, which was later withdrawn from publication by the journal's editor-in-chief. Resp. Ex. C at 8. Dr. Whitton stated that Dr. Blitshteyn did not cite to any studies funded by independent sources like the NIH. *Id*. at 5-6.

Petitioner filed a supplemental expert report and supporting medical literature from Dr. Blitshteyn on June 8, 2018. Pet. Ex. 43-52, ECF No. 25; Pet. Ex. 53-54, ECF No. 26. According to Dr. Blitshteyn, "evidence from [petitioner's] medical records shows that his diagnosis of POTS is 100% accurate, confirmed by objective diagnostic tests, and is irrefutable." *Id*. at 3. Two neurologists and a cardiologist from the Mayo Clinic confirmed that petitioner had POTS. *Id*. at 1-2. She stated that petitioner meets all the diagnostic criteria for POTS as provided by the American Autonomic Society consensus statement. *Id*. at 2. She disagreed with Dr. Gibbons that POTS can be caused by deconditioning and cited a study which found that POTS was due to abnormally low ventricular filling pressures and other abnormalities in cardiovascular physiology. *Id*. at 2-3. She submitted that, if petitioner's initial syncopal event had been caused by dehydration, as suggested by Dr. Gibbons, petitioner would have returned to his previously level of health and would not have developed "chronic symptoms of POTS." *Id*. at 2. In response to Dr. Whitton's criticisms of her reliance on literature authored by Dr. Shoenfeld, Dr. Blitshteyn stated that she has never met Dr. Shoenfeld and therefore does not collaborate with him. *Id*. at 4. She agreed with Dr. Whitton "that there is currently no evidence that HPV vaccines cause POTS…the question of whether HPV vaccines cause POTS remains unanswered." *Id*. She reiterated that, based on petitioner's positive ANA and lack of other triggers for POTS, it must have been caused by the HPV vaccine. *Id*. at 3.

Respondent filed responsive expert reports from Dr. Gibbons and Dr. Whitton on September 6, 2018. Resp. Ex. E-F, ECF No. 29. Dr. Gibbons criticized Dr. Blitshteyn's reliance on a single abnormal reading in order to establish a diagnosis of POTS. Resp. Ex. E at 2. He clarified that the autonomic function testing diagnosed a postural tachycardia, not a postural tachycardia syndrome. Similarly, he noted that the doctors that Dr. Blitshteyn claims diagnosed petitioner with POTS referred to him as having "postural tachycardia"; another listed diagnoses of

both POTS and FNSD. Dr. Gibbons emphasized that a single elevated heart rate during autonomic dysfunction testing did not confer a "lifelong diagnosis" of POTS. *Id*. at 3. In addressing Dr. Blitshteyn's point that rehydration did not resolve petitioner's syncopal episodes, Dr. Gibbons noted that petitioner had "a creatinine level of 1.76 (an indication of acute kidney injury), [and] a myoglobin level of 988 (an indication of diffuse muscle damage due to dehydration)" which suggests exertional heat illness ("EHI"), a consequence more severe than "simply dehydration." According to Dr. Gibbons, 30% of patients with EHI require three weeks to recover and 3% never return to participation in sports. *Id*. at 3-4. In response to Dr. Blitshteyn's opinion that POTS is not caused by deconditioning, Dr. Gibbons pointed out that the study Dr. Blitshteyn cited involved cardiopulmonary exercise testing, which petitioner has not had. Dr. Gibbons reiterated that the antibodies cited by Dr. Blitshteyn have been associated with POTS but are not known to cause POTS and are also found in healthy people and other diseases. *Id*. at 5. Similarly, he noted that a positive ANA may be linked to POTS, but that does not indicate causality.

Dr. Whitton noted that Dr. Blitshteyn did not address several of the criticisms from his initial report, most notably his opinion that she relied on flawed literature to support her theory. Resp. Ex. F at 3-4. He criticized her statement that "Vaccination is a known trigger of POTS," stating that she has not produced any data to support this assertion. *Id*. at 4. He also noted that one of her references, Pet. Ex. 45, stated that there was insufficient evidence to support an autoimmune cause of POTS. Resp. Ex. F at 2-3. He posited that, if an autoimmune cause of POTS has not been established, then a positive ANA is not necessarily supportive of a diagnosis of POTS. *Id.* at 3.

A Rule 5 status conference was held on November 8, 2018. Scheduling Order at 1, ECF No. 31. During the conference, I asked about petitioner's current condition. Petitioner's counsel advised that, as of August 2017, petitioner was receiving regular IV saline infusions to treat POTS. *Id*. at 4. I noted that Dr. Blitshteyn previously offered the same theory when she served as petitioner's expert in *Turkupolis v. Sec'y of Health & Human Servs.*, No. 10-351V, 2014 WL 2872215 (Fed. Cl. Spec. Mstr. May 30, 2014). The special master ruled that petitioner did not satisfy *Althen* prong I, the requirement to provide a reliable medical theory causally connecting the vaccine to the alleged injury. Additionally, in *Turkupolis*, Dr. Blitshteyn compared POTS to GBS, citing the onset period for GBS of three to 42 days after vaccination. *Id*. at 20. Petitioner in this matter had an onset of symptoms two days after his vaccination. I further noted that Dr. Blitshteyn admitted in her supplemental report that there is currently no evidence that HPV vaccines cause POTS. Scheduling Order at 4, ECF No. 31. Additionally, she failed to address criticisms of her reliance on studies funded by the Dwoskin Foundation. Petitioner's counsel suggested filing a supplemental expert report from Dr. Blitshteyn in order to address the timing of onset issue and to allow Dr. Blitshteyn to provide additional support for her theory. *Id*. Dr. Blitshteyn criticized Dr. Gibbons for failing to cite to the record to support his assertion that petitioner had a high resting heart rate prior to vaccination. She stated that she found no evidence of postural tachycardia on any of petitioner's physical exams. In his supplemental report, Dr. Gibbons cited pre-vaccination appointments where petitioner recorded an elevated resting heart rate. Petitioner's counsel suggested submitting an expert report from a cardiologist to address the significance, if any, of petitioner's history of elevated resting heart rates. *Id*. at 4-5. Petitioner was ordered to file updated medical records and any expert and/or supplemental expert reports. *Id*. at 5.

4

Petitioner filed updated medical records on February 1, 2019 and an expert report from Dr. Berger, a cardiologist, on February 26, 2019. Pet. Ex. 55-57, ECF No. 33; Pet. Ex. 58-59, ECF No. 34.

On March 4, 2019, petitioner filed an additional report and medical literature from Dr. Blitshteyn. Pet. Ex. 60-63, ECF No. 35. Dr. Blitshteyn did not address her failure to satisfy prong I of *Althen*, the same issue that occurred in *Turkupolis*, and was discussed during the Rule 5 conference. She only addressed prong III, stating that "any interval from days to eight weeks would be an appropriate interval to denote an immune mediated reaction to the vaccine." Pet. Ex. 60 at 11.

On March 5, 2019, petitioner filed an expert report from Dr. Steinman, a neuroimmunologist. Pet. Ex. 64, ECF No. 36. Petitioner filed medical literature cited by Dr. Steinman on March 28, 2019. Pet. Ex. 65-74, ECF No. 39; Pet. Ex. 75-84, ECF No. 40; Pet. Ex. 85, ECF No. 41. Dr. Steinman opined that the HPV vaccine can cause POTS via the theory of molecular mimicry. Pet. Ex. 64 at 12-14. He conducted BLAST searches and relied on experimental autoimmune encephalitis ("EAE") studies. He explained that in EAE, five amino acids within a stretch of 12 amino acids can induce EAE and paralyze mice. He concluded that homologies seen between components of the HPV vaccine and adrenergic receptors are concordant with the degree of homology sufficient to cause serious disease in experimental animals. *Id.*

A status conference was held on May 21, 2019. During the conference, I noted that petitioner's updated medical records indicated that he continued to receive saline infusions to treat POTS. Scheduling Order at 1, ECF No. 44. I advised petitioner that Dr. Blitshteyn needed to explain, with specificity, how the saline infusions treat POTS. *Id.* at 1. I further noted that Dr. Steinman placed great weight on studies of EAE induced in mice as a model for MS; however, Dr. Steinman has yet to explain how this experimental model for a central nervous system ("CNS") disease in a mouse correlates to an autonomic disorder in a human. *Id.* at 2. Moreover, I noted that Dr. Steinman is a board-certified neurologist who specializes in MS and other CNS disorders, while Dr. Blitshteyn is a neurologist who specializes in POTS. *Id.* Petitioner's counsel advised that Dr. Steinman was asked to provide an opinion as an immunologist. *Id.* Petitioner's counsel was advised that any subsequent reports from Dr. Steinman or another immunologist needed to address only immunology, and with specificity, how the HPV vaccine could attack the autonomic nervous system and result in the development of POTS. *Id.*

Petitioner filed a status report ("Pet. S.R.") on July 22, 2019, advising that supplemental expert reports would be submitted by Dr. Blitshteyn and Dr. Steinman. Pet. S.R. at 1, ECF No. 45. Petitioner further advised that he intended to submit an expert report from Dr. Akbari, an immunologist, "to further address how the HPV vaccine can attack the autonomic nervous system and result in the development of POTS." *Id.*

An Order was issued advising that petitioners are limited to one expert per field and that petitioner's counsel had previously advised that Dr. Steinman was being submitted as an expert in immunology. Scheduling Order at 1, ECF No. 46. Petitioner was advised that, if he intended to continue with Dr. Steinman, he would not be permitted to file reports from another immunologist.

*Id.* Petitioner was ordered to file a status report advising whether he wished to replace Dr. Steinman with Dr. Akbari. *Id.*

Petitioner filed a status report on July 29, 2019, advising that he would be filing a supplemental report from Dr. Steinman and would not be submitting a report from Dr. Akbari. Pet. S.R. at 1, ECF No. 47.

On November 11, 2019, petitioner filed supplemental reports from Drs. Blitshteyn and Steinman. Pet. Ex. 88-93, ECF No. 49; Pet. Ex. 94-96, ECF No. 50. Respondent filed responsive reports from Drs. Gibbons and Whitton on April 22, 2020. Resp. Ex. G-H, ECF No. 55.

On March 4, 2020, petitioner filed a Motion for Interim Attorneys' Fees and Costs, requesting $56,361.90 in attorneys' fees and $32,383.59 in attorneys' costs, for a total of $88,644.49. Motion for Interim Fees, ECF No. 52. In accordance with General Order #9, petitioner's counsel represents that petitioner did not incur any out-of-pocket expenses. ECF No. 53.

Respondent filed a response to petitioner's application for fees on March 16, 2020. Response, ECF No. 54. Respondent "defer[red] to the Special Master to determine whether or not petitioner has met the legal standard for an interim fees and costs award as set forth in Avera v. HHS." *Id.* at 2. Respondent further left "it to the discretion of the Special Master to determine whether the statutory requirements for an award of attorney's fees and costs have been met in this case, particularly whether there is a reasonable basis for the claim." *Id.* Petitioner did not file a reply.

Following the filing of petitioner's interim fee application, respondent filed additional reports and medical literature from Drs. Gibbons and Whitton. Resp. Ex. G Tabs 1-5, Resp. Ex. H Tabs 1-8, Resp. Ex. I-K, ECF No. 55. Petitioner filed responsive reports and medical literature from Drs. Blitshteyn and Steinman on July 21, 2020. Pet. Ex. 97-110, ECF No. 57. A deadline has been set for respondent to file responsive reports.

This matter is now ripe for determination.

## II. Applicable Law

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petition results in compensation, petitioner is entitled to reasonable attorneys' fees and costs ("fees" or "fee award"). *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). Where a petitioner does not prevail on entitlement, a special master has discretion to award reasonable fees if the petition was brought in "good faith" and with a "reasonable basis" for the claim to proceed. § 15(e)(1). A petitioner's good faith is presumed "in the absence of direct evidence of bad faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Where no evidence of bad faith exists and respondent does not challenge petitioner's good faith, good faith requires no further analysis.

Reasonable basis is an objective inquiry, irrespective of counsel's conduct or looming statute of limitations, that evaluates the sufficiency of petitioner's available medical records at the time a claim is filed. *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017); *see Turpin v. Sec'y of Health & Human Servs.*, No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). A special master's evaluation of reasonable basis is to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient objective evidence to make a feasible claim for recovery. *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018). Reasonable basis is satisfied when available objective evidence, such as medical records or medical opinions, support a feasible claim prior to filing. *See Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)); *see Silva v. Sec'y of Health & Hum. Servs.*, 108 Fed. Cl. 401, 405 (2012). Where causation is a necessary element to petitioner's claim, petitioner must provide some objective support of a causal relationship between administration of the vaccine and the petitioner's injuries in order to establish that a claim was feasible. *See Bekiaris v. Sec'y of Health & Human Servs.*, 140 Fed. Cl. 108, 114 (2018).

Determination of feasibility is limited to the objective evidence submitted, *Santacroce*, 2018 WL 405121 at *7, but a special master is not precluded from considering objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation."*Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018). In *Cottingham*, the Federal Circuit expressly clarified that special masters are permitted to utilize a totality of the circumstances inquiry in evaluating reasonable basis, including, but not exclusively limited to, objective factors such as those identified in *Amankwaa*. *See Cottingham ex. rel. K.C. v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344 (Fed. Cir. 2020). The Court reiterated that counsel conduct is subjective evidence, not to be considered when evaluating reasonable basis. *Cottingham*, 971 F.3d at 1345.

While incomplete records do not strictly prohibit a finding of reasonable basis, *Chuisano*, 116 Fed. Cl. at 288, an overwhelming lack of objective evidence will not support reasonable basis. *See Simmons,* 875 F.3d at 634-36 (holding that reasonable basis was not satisfied where 1) petitioner's medical record lacked proof of vaccination and diagnosis and 2) petitioner disappeared for two years prior to filing a claim). Additionally, a petitioner's own statements are not "objective" for purposes of evaluating reasonable basis and cannot alone support reasonable basis. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Human Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018). A claim may lose reasonable basis as it progresses, if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Pereira v. Sec'y of Health & Hum. Servs.,* 33 F.3d 1375, 1376-77 (Fed. Cir. 1994)).

Despite broad discretion, a special master may not abuse their discretion in denying reasonable basis and fees. The Federal Circuit articulated, "failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion" by the special master. *Cottingham*, 971 F.3d at 1345. The petitioner in *Cottingham* submitted an affidavit, a vaccine package insert and several medical records showing that petitioner suffered adverse reactions listed on the package insert after receiving the vaccine. *See id.* at 1345-46. The

7

Court found that the materials constituted such objective evidence that denying reasonable basis because of "no evidence" was clearly erroneous. *Id.* at 1346-47. Denial of reasonable basis for lack of causation in *Cottingham* constituted an abuse of discretion. *Id.* at 1347. The Court reminded that the burden of proof required for reasonable basis is not as high as that required for causation— "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Id.* at 1346. However, the Court held that the special master may make factual determinations as to the weight of evidence. *Id.* at 1347.

## III. Analysis

### A.  Reasonable Basis

In his application for interim fees, petitioner submitted that he has met the reasonable basis requirement by virtue of the multiple expert reports authored on his behalf by Dr. Blitshteyn, Dr. Steinman, and Dr. Berger. *See* Motion for Interim Fees at 18-19. Petitioner is correct that an expert opinion supported by medical literature bolsters the basis for a claim; however, an expert opinion "in and of itself does not determine reasonableness." *Murphy v. Sec'y of Health & Human Servs.*, 30 Fed. Cl. 60, 62 (1993).

Ultimately, though, the amount of support required for a claim to meet the reasonable basis requirement is lower than the "preponderance of the evidence" standard used for entitlement decisions. *See Chuisano*, 116 Fed. Cl. at 283. At this juncture, petitioner has met this nebulous standard. Petitioner is advised, however, that a claim may lose reasonable basis as it progresses, if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019). In order for this claim to maintain reasonable basis moving forward, there are issues in this matter that need to be addressed, including but not limited to, whether petitioner has provided preponderant evidence that he suffers from POTS; whether petitioner can sustain his burden under *Althen*, where Dr. Blitshteyn has relied on studies with questionable results funded by the Dwoskin Foundation and has admitted that there is no literature to support that HPV vaccines can cause POTS; whether Dr. Steinman's theory of molecular mimicry in central nervous system disorders can be applied to an autonomic nervous system disorder; and where no definitive time frame for the onset of POTS following vaccination has been provided. Petitioner is cautioned that while reasonable basis for the filing of the petition has been found for the purposes of this application for interim attorneys' fees and costs, this decision should in no way be interpreted to mean that I have made a determination that this matter can maintain reasonable basis going forward.[3]

---

[3] Petitioner is advised that, thus far, HPV/POTS claims have generally been unsuccessful in the Vaccine Program. *See, e.g., Balasco v. Sec'y of Health & Human Servs.*, No. 17-215V, 2020 WL 1240917 (Fed. Cl. Spec. Mstr. Feb. 14, 2020) (Compensation denied to petitioner who alleged two HPV vaccinations caused autonomic dysfunction, POTs, fibromyalgia, and orthostatic intolerance where petitioner's tilt table results did not support a diagnosis of POTS or orthostatic intolerance and petitioner's experts, Dr. Shoenfeld and Dr. Miglis, provided a theory of causation that was inapplicable to petitioner's fibromyalgia and vestibular migraine diagnoses); *McKown v. Sec'y of Health & Human Servs.*, No. 15-1451V, 2019 WL 4072113, at *1, 15-16 (Fed. Cl. Spec. Mstr. July 15, 2019) (Compensation denied to petitioner who alleged that two doses of an HPV vaccine and a hepatitis A vaccine caused or significantly aggravated POTS and skin rashes where petitioner's expert, Dr. Tornatore, offered molecular mimicry as a causal mechanism but no "literature evidencing homology between the HPV vaccine components and any specific tissues in the

## B.      Availability of Interim Fees

Special masters are afforded broad discretion in determining whether interim fees are appropriate. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008). The court in *Avera* held that interim fees may be awarded "in appropriate circumstances." *Id*. at 1351. The court then listed some circumstances—cases involving "protracted" proceedings and "costly experts"—in which it would be "particularly appropriate" to award interim fees. 515 F.3d at 1352. But "the Federal Circuit in *Avera . . .* did not enunciate the universe of litigation circumstances which would warrant an award of interim attorneys' fees," *Woods v. Sec'y of Health & Human Servs.*, 105 Fed. Cl. 148, 154 (2012), and "special masters [retain] broad discretion in determining whether to award" them. *Al-Uffi ex rel. R.B. v. Sec'y of Health & Human Servs*. No. 13-956V, 2015 WL 6181669, at \*5 (Fed. Cl. Spec. Mstr. Sept. 30, 2015). In making this determination, "the special master may consider any of the unique facts of a case." *Rehn v. Sec'y of Health & Human Servs.*, 126 Fed. Cl. 86, 94 (2016).

Under the circumstances of this case, interim fees are warranted. This matter has been pending for over three years, which ordinarily "suffice[s] to constitute the type of 'circumstances' to warrant an interim fee award." *Woods*, 105 Fed. Cl. at 154; *see also, e.g., Thompson v. Sec'y of*

_____

autonomic nervous system"); *Johnson v. Sec'y of Health & Human Servs.*, No. 14-254V, 2018 WL 2051760, at \*1, 9-10 (Fed. Cl. Spec. Mstr. Mar. 23, 2018) (Compensation denied to petitioner who alleged that the third dose of HPV vaccine caused her leg pain, joint pain, difficulty breathing, eye drooping, fatigue, and/or POTS where petitioner's expert, Dr. Shoenfeld, offered molecular mimicry between components of the HPV vaccine and nerve ending receptors as a causal mechanism but could not identify the location of the receptors); *L.A.M. v. Sec'y of Health & Human Servs*., No. 11-852V, 2017 WL 897430 (Fed. Cl. Spec. Mstr. Jan. 31, 2017) (Compensation denied to petitioner who alleged that an HPV vaccination caused her to develop migraine headaches, POTS, chronic fatigue syndrome, undifferentiated connective tissue disease, and/or small fiber polyneuropathy where petitioner's expert, Dr. Shoenfeld, opined that a combination of the effects of the surface antigen of the HPV vaccine and the adjuvants in the vaccine induced petitioner's autoimmune conditions); *see also Wagner on behalf of S.W. v. Sec'y of Health & Human Servs.*, No. 19-188V, 2020 WL 6554930 (Fed. Cl. Spec. Mstr. Oct. 14, 2020); *Muller v. Sec'y of Health & Human Servs.*, No. 18-1258V, 2020 WL 6267971 (Fed. Cl. Spec. Mstr. Oct. 2, 2020); *Dalton v. Sec'y of Health & Human Servs.*, No. 15-1465V, 2020 WL 5800716 (Fed. Cl. Spec. Mstr. Aug. 31, 2020); *Walker v. Sec'y of Health & Human Servs.*, No. 16-543V, 2020 WL 5641871 (Fed. Cl. Spec. Mstr. Aug. 25, 2020); *Wall on behalf of G.W. v. Sec'y of Health & Human Servs.*, No. 17-583V, 2020 WL 5526754 (Fed. Cl. Spec. Mstr. Aug. 19, 2020); *McElerney v. Sec'y of Health & Human Servs.*, No. 16-1540V, 2020 WL 4938429 (Fed. Cl. Spec. Mstr. July 28, 2020); *Raymer v. Sec'y of Health & Human Servs.*, No. 18-794V, 2020 WL 4362147 (Fed. Cl. Spec. Mstr. July 6, 2020); *Otto v. Sec'y of Health & Human Servs.*, No. 16-1144V, 2020 WL 4719285 (Fed. Cl. Spec. Mstr. June 17, 2020); *K.L. v. Sec'y of Health & Human Servs.*, No. 16-645V, 2020 WL 2467083 (Fed. Cl. Spec. Mstr. Apr. 9, 2020); *Ingber v. Sec'y of Health & Human Servs.*, No. 18-1061V, 2019 WL 7818779 (Fed. Cl. Spec. Mstr. Dec. 30, 2019); *A.H. v. Sec'y of Health & Human Servs.*, No. 16-934V, 2019 WL 4648909 (Fed. Cl. Spec. Mstr. Aug. 29, 2019); *Smithson v. Sec'y of Health & Human Servs.*, No. 13-735V, 2019 WL 1992636 (Fed. Cl. Spec. Mstr. Apr. 9, 2019); *Wright v. Sec'y of Health & Human Servs.*, No. 15-1436V, 2017 WL 6997297 (Fed. Cl. Spec. Mstr. Dec. 27, 2017); *Brannigan v. Sec'y of Health & Human Servs.*, No. 14-675V, 2017 WL 1632492 (Fed. Cl. Spec. Mstr. Apr. 7, 2017); *Axelson v. Sec'y of Health & Human Servs.*, No. 15-234V, 2015 WL 4608143 (Fed. Cl. Spec. Mstr. July 6, 2015); *Boyer v. Sec'y of Health & Human Servs.*, No. 12-517V, 2014 WL 643460 (Fed. Cl. Spec. Mstr. Jan. 27, 2014); *Weppler v. Sec'y of Health & Human Servs.*, No. 12-316V, 2014 WL 643581 (Fed. Cl. Spec. Mstr. Jan. 24, 2014).

*Health & Human Servs.*, No. 12-475V, 2018 WL 1559799, at *1 (Fed. Cl. Spec. Mstr. Feb. 28, 2018) ("[I]nterim attorneys' fees and costs are appropriate because waiting for the conclusion of the case would place an undue hardship in petitioner"); *Kottenstette v. Sec'y of Health & Human Servs.*, No. 15-1016V, 2017 WL 5662780, at *3 (Fed. Cl. Spec. Mstr. Oct. 30, 2017) (finding two-year proceeding constituted appropriate circumstances for interim fees). Moreover, petitioner has expended significant time and costs in litigating this matter, and with the current case load, an entitlement hearing cannot be held for quite some time. In sum, the circumstances of this case warrant an award of interim fees and costs, so as not to impose economic hardship on petitioners.

## C.    Reasonable Hourly Rate

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorneys' fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id*. This is known as the *Davis County* exception. *Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[4]

Petitioner requested the following hourly rates for the counsel in this matter: for Aaron Siri, $363.00 for work performed in 2016 and $376.00 for work performed in 2017; for Mark Farmer, $221.00 for work performed in 2016 and $230.00 for work performed in 2017; for Joseph Krueger, $240.00 for work performed in 2017 and $249.00 for work performed in 2018; and for

---

[4] The fee schedules are posted on the Court's website. *See* Office of Special Masters, *Attorneys' Forum Hourly Rate Fee Schedule: 2015-2016*, http://www.uscfc.uscourts.gov/sites/default/files/Attorneys - Forum-Rate-Fee-Schedule2015-2016.pdf (last visited Dec. 2, 2020); Office of Special Masters, *Attorneys' Forum Hourly Rate Fee Schedule: 2017*, http://www.uscfc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2017.pdf (last visited Dec. 2, 2020); Office of Special Masters, *Attorneys' Forum Hourly Rate Fee Schedule: 2018*, http://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf (last visited Dec. 2, 2020); Office of Special Masters, *Attorneys' Forum Hourly Rate Fee Schedule: 2019*, http://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf (last visited Dec. 2, 2020); Office of Special Masters, *Attorneys' Form Hourly Rate Fee Schedule: 2020*, http://uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202020.PPI_OL.pdf (last visited Dec. 2, 2020).

Jessica Wallace, $300.00 for work performed in 2018, $311.00 for work performed in 2019, and $323.00 for work performed in 2020. For paralegals, petitioner has requested rates of $140.00 for work performed in 2016, $145.00 for work performed in 2017, $150.00 for work performed in 2018, $156.00 for work performed in 2019; and $162.00 for work performed in 2020.

The rates requested for Mr. Siri are consistent with rates previously awarded. *See, e.g., Falbo v. Sec'y of Health & Human Servs.*, No. 18-1547V, 2020 WL 1480317, at *2 (Fed. Cl. Spec. Mstr. Feb. 12, 2020); *Barry v. Sec'y of Health & Human Servs.*, No. 12-039V, 2016 U.S. Claims LEXIS 1767, at *9 (Fed. Cl. Spec. Mstr. Oct. 25, 2016).

The rates requested for Mr. Krueger, who has been practicing since 2007, and Mr. Farmer, who became licensed to practice law in 1991, are reasonable and I award them herein.[5] *See* Motion for Interim Fees at 23-24.

The hourly rates requested for Ms. Wallace exceed the respective *McCulloch* rates and therefore must be adjusted. In his fee application, petitioner argues that Ms. Wallace's prior experience as a paralegal in vaccine cases merits an hourly rate above the appropriate *McCulloch* range. The Chief Special Master rejected this argument in *Falbo*, noting that the Attorney's Forum Hourly Rate Schedule specifically notes experience is calculated based on the year an attorney was admitted to the bar. *Falbo*, 2020 WL 1480317 at *2. Ms. Wallace was awarded rates of $195 for 2018 and $205 for 2019 based on her admission to the bar in 2018. *Id.* The *McCulloch* category for an attorney with two years of experience in 2020 is $169.00 to $253.00. Because Ms. Wallace does have prior paralegal experience with vaccine cases, a rate on the higher end of the appropriate range is reasonable. Accordingly, I award Ms. Wallace an hourly rate of $231.00 for work performed in 2020.

The hourly rates requested for paralegals conform with the rates previously awarded in *Falbo* and with the Attorney's Forum Hourly Rate Schedule and are awarded herein.

Based on the adjustments to the hourly rates as discussed above, petitioner's attorneys' fees are reduced from $56,361.90 to $43,006.50.[6]

---

[5] The rates requested for Mr. Krueger and Mr. Farmer are below the appropriate *McCulloch* ranges for attorneys of their experience. However, based on petitioner's extensive discussion of hourly rates and experience ranges in *McCulloch* in his fee application, the lead counsel on this matter, Ms. Wallace, is clearly aware of the *McCulloch* rates but has chosen to bill these attorneys at lower rates. Therefore, the rates requested by petitioner are the rates that will be awarded to Mr. Krueger and Mr. Farmer.

[6]

| Hours worked | Rate Billed | Fees Billed | Rate Awarded | Fees Awarded | Reduction |
|---|---|---|---|---|---|
| 44.2 | 300.00 | $13,260.00 | 195.00 | $8,619.00 | $4,641.00 |
| 79 | 311.00 | $24,569.00 | 205.00 | $16,195.00 | $8,374.00 |
| 3.7 | 323.00 | $1,195.10 | 231 | $854.70 | $340.40 |
| Subtotal | | $39,024.10 | | $25,668.70 | $13,355.40 |
| Total | Overall Fees Billed | $56,361.90 | Overall Fees Awarded | $43,006.50 | $13,355.40 |

11

**D.    Hours Reasonably Expended**

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal. *O'Neill v. Sec'y of Health & Human Servs.*, No. 08-243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Human Servs.*, No. 08-756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No 14-1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

Upon review of the hours billed by petitioner's counsel, the majority of hours billed appear to be reasonable. It appears that one paralegal erred in billing 0.7 hours at a rate of $300.00 rather than the appropriate paralegal rate of $150.00, *see* Motion for Interim Fees, Ex. 1 at 30, and the award of attorneys' fees will be reduced accordingly. Otherwise, I see no need for further reductions. Petitioner is hereby awarded $42,901.50 in attorneys' fees.[7]

**E.    Reasonable Costs**

Petitioner requested $32,282.59 in attorneys' costs. The requested costs consist of $17,032.00 in expert fees to Dr. Blitshteyn, $10,375.00 in expert costs to Dr. Steinman, $3,000.00 in expert costs to Dr. Berger, $707.20 in costs associated with obtaining medical records, the $400.00 filing fee, $393.94 in shipping and mailing costs, $179.25 in costs associated with obtaining medical literature, $166.03 in shipping and copying costs, and $29.17 for office supplies. *See* Motion for Interim Fees, Ex. 1 at 72-110.

Petitioner's requested costs merit some reductions. Petitioner has not offered sufficient documentation for some of the requested costs, specifically $281.56 in shipping and mailing costs. Petitioner can resubmit these costs with appropriate documentation in his final fee application. Additionally, petitioner requested $29.17 for purchase of a binder and dividers. These items are

---

[7] 0.7 hours x 300.00 = $210.00. 0.7 hours x 150.00 = $105.00. $43,006.50 - $150.00 = $42,901.50.

classified as attorney overhead costs and are not reimbursable by the Vaccine Program. *D.S. v. Sec'y of Health & Human Servs.*, No. 10-77V, 2017 WL 6397826, at *8 (Fed. Cl. Spec. Mstr. Nov. 20, 2017); *McSorley v. Sec'y of Health & Human Servs.*, No. 14-919V, 2018 WL 4390500, at *2 (Fed. Cl. Spec. Mstr. Aug. 16, 2018) (Declining to reimburse petitioner's attorney for the costs of CDs, as "[a]n attorney's hourly rate is designed to produce income to pay for general overhead expenses"); *Windhorst v. Sec'y of Health & Human Servs.*, No. 13-647V, 2017 WL 4768125 (Fed. Cl. Spec. Mstr. Sept. 27, 2017) (Declining to reimburse petitioner's attorney for "office supplies, such as binders"). In sum, $310.73 of petitioner's requested costs are not eligible for reimbursement. Petitioner is awarded $31,971.86 in costs.

## IV. Total Award Summary

Based on the foregoing, petitioner's Motion for Interim Attorneys' Fees and Costs is **GRANTED IN PART**. Accordingly, I award **$74,873.36**, representing $42,901.50 in attorneys' fees and $31,971.86 in attorneys' costs in the form of a check payable jointly to **petitioner and petitioner's counsel, Jessica Wallace**. The Clerk of the Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.